[963 NE2d 1219, 940 NYS2d 518]

JOHN GRONSKI et al., Appellants, v COUNTY OF MONROE, Respondent.

Argued October 12, 2011; decided November 17, 2011

## POINTS OF COUNSEL

*The Wolford Law Firm LLP*, Rochester (*Elizabeth A. Wolford* and *Michael R. Wolford* of counsel), for appellants. I. The out-of-possession landlord standard for premises liability should not be applied outside the landlord-tenant context. (*Peralta v Henriquez*, 100 NY2d 139; *Basso v Miller*, 40 NY2d 233; *Melo v LaGuardia Fitness Ctr. Corp.*, 72 AD3d 761; *Litwack v Plaza Realty Invs., Inc.*, 11 NY3d 820; *Chapman v Silber*, 97 NY2d 9; *Campbell v Holding Co.*, 251 NY 446; *Putnam v Stout*, 38 NY2d 607; *Juarez v Wavecrest Mgt. Team*, 88 NY2d 628; *Guzman v Haven Plaza Hous. Dev. Fund Co.*, 69 NY2d 559; *Rousseau v Gugliuzza*, 285 AD2d 993.) II. The Fourth Department's decision conflicts with decisions from the First, Second and Third Departments that have refused to apply the out-of-possession landlord standard outside the leasehold context. (*Page v State of New York*, 72 AD3d 1456; *Fernandez v Town of Babylon*, 72 AD3d 636; *Scott v Redl*, 43 AD3d 1031; *Perez v Metropolitan Museum of Art*, 304 AD2d 481; *Ferro v Burton*, 45 AD3d 1454; *Thompson v Port Auth. of N.Y. & N.J.*, 305 AD2d 581; *Regensdorfer v Central Buffalo Project Corp.*, 247 AD2d 931.) III. Even if the out-of-possession landlord standard applied, it is apparent that defendant should be held to a duty of care since one of the exceptions applies. (*Kolmel-Hayes v South Shore Cruise Lines*,

*Inc.*, 23 AD3d 530; *Gerber v West Hempstead Convenience*, 2 AD3d 260; *Gilmartin v Tempestoso*, 273 AD2d 875; *Hughes v Cold Spring Constr. Co.*, 26 AD3d 858; *Strunk v Zoltanski*, 62 NY2d 572.) IV. Defendant had a nondelegable duty to provide plaintiff with a safe place to work. (*Scott v Redl*, 43 AD3d 1031; *Kleeman v Rheingold*, 81 NY2d 270; *Backiel v Citibank*, 299 AD2d 504; *Rosenberg v Equitable Life Assur. Socy. of U.S.*, 79 NY2d 663; *Bart v Universal Pictures*, 277 AD2d 4; *Reid v Styco of Rochester*, 214 AD2d 955.)

*Gibson, McAskill & Crosby, LLP*, Buffalo (*Victor Alan Oliveri* of counsel), for respondent. I. The County of Monroe relinquished operational control over the Monroe County Recycling Center and therefore should *not* be subject to liability in tort for injuries allegedly sustained by plaintiff while working at the recycling center as an employee of Metro Waste Paper Recovery U.S., Inc., the independent contractor retained by the County to operate the recycling center. (*Ritto v Goldberg*, 27 NY2d 887; *Butler v Rafferty*, 100 NY2d 265; *Kleeman v Rheingold*, 81 NY2d 270; *Brothers v New York State Elec. & Gas Corp.*, 11 NY3d 251; *City of New York v Pennsylvania R.R. Co.*, 37 NY2d 298; *Fresina v Nebush*, 209 AD2d 1004; *Ferro v Burton*, 45 AD3d 1454; *Regensdorfer v Central Buffalo Project Corp.*, 247 AD2d 931; *Thompson v Port Auth. of N.Y. & N.J.*, 305 AD2d 581; *Stark v Port Auth. of N.Y. & N.J.*, 224 AD2d 681.) II. The County of Monroe did not owe a nondelegable duty to provide for plaintiff's safety. (*Rosenberg v Equitable Life Assur. Socy. of U.S.*, 79 NY2d 663; *Whitaker v Norman*, 75 NY2d 779; *McDonald v Shell Oil Co.*, 20 NY2d 160; *Besner v Central Trust Co. of N.Y.*, 230 NY 357; *Kleeman v Rheingold*, 81 NY2d 270; *Brothers v New York State Elec. & Gas Corp.*, 11 NY3d 251; *Khan v Bangla Motor & Body Shop, Inc.*, 27 AD3d 526; *Bart v Universal Pictures*, 277 AD2d 4; *Nagy v State of New York*, 89 AD2d 199.)

**OPINION OF THE COURT**

CIPARICK, J.

At issue in this appeal is whether the courts below erred in finding, as a matter of law, that defendant County of Monroe (the County) relinquished control over a county-owned but independently operated recycling center such that the County is not liable to plaintiff John Gronski for injuries sustained as a result of an unsafe condition on the premises. We hold that an issue of fact exists as to whether and to what extent the County exercised control over the subject property.

## I.

Plaintiff was employed as a mechanic by Metro Waste Paper Recovery U.S., Inc. (Metro Waste) at a recycling center owned by the County. Metro Waste operated the facility as an independent contractor. On August 11, 2003, plaintiff was walking through the recycling center when a bale of paper weighing nearly one ton fell from a stack of other bales and landed on him. According to plaintiff's complaint, the stacked bales were not properly placed in the designated storage area, and no support mechanisms were used to secure them in place. As a result of the accident, plaintiff sustained serious injuries, including numerous bone fractures, a torn urethra, internal bleeding and a collapsed lung. An Occupational Safety and Health Administration (OSHA) investigation report stated that the unsecured stacked bales presented a serious regulatory violation.[1] Metro Waste was cited accordingly.

The relationship between the County and Metro Waste is governed by an operations and maintenance agreement (the agreement), which the parties entered into in 2002. The agreement established that Metro Waste "shall have complete charge of and responsibility for the Facility and Facility Site, its subcontractors, materialmen, materials, equipment and personnel engaged in the performance of its work [and] . . . shall perform its work in accordance with its own methods . . . subject to the limited review authority of the County." The agreement also assigned all responsibility for repair, maintenance and safety at the facility to Metro Waste. The County, however, retained "the right of access to the Facility in order to determine compliance by the Contractor with the terms and conditions of this Agreement, and . . . the right . . . to take visitors and group tours through . . . the Facility." The agreement also gave the County the right to, among other things, determine which persons were authorized to utilize the recycling center, access all books and records maintained and terminate the agreement for cause on 10 days notice. Finally, the agreement required Metro Waste to submit for the County's approval an annual program manual describing its "Plant Operating Procedures, including maintenance, staffing, health and safety."

---

1. The relevant regulation, 29 CFR 1910.176 (b), provides: "Storage of material shall not create a hazard. Bags, containers, bundles, etc., stored in tiers shall be stacked, blocked, interlocked and limited in height so that they are stable and secure against sliding or collapse."

Plaintiff commenced the instant action[2] against the County alleging that the County was negligent for failing to exercise due care to prevent an unsafe condition, to wit, improperly stacked and stored bales at the recycling center. Plaintiff also claimed that the County was negligent in allowing a defective baler to be used at the recycling center, resulting in improperly wound bales that contributed to the accident.[3] The County moved for summary judgment, arguing that, like an out-of-possession landlord, it had relinquished all control over the maintenance and operations of the recycling center to Metro Waste pursuant to the agreement and was not contractually obligated to repair unsafe conditions on the premises.

In opposition to the County's motion, plaintiff submitted the deposition testimony of County Department of Environmental Services engineers Patrick Collins and Russell Rutkowski, and Metro Waste general manager Jeffrey Meyers. Collins testified that he conducted public tours at the facility approximately every week. Rutkowski was charged with overseeing Metro Waste's compliance with the agreement. He testified that he visited the recycling center unannounced on a weekly basis, typically walking through the entire facility to ensure that work was being performed in accordance with the agreement's terms. Both plaintiff and Meyers attested to seeing Rutkowski at the facility, with Meyers stating that the visits typically lasted about an hour. When asked about his oversight authority on maintenance and safety issues at the facility, Rutkowski vacillated, stating both that he did and did not possess the authority to monitor and report safety hazards. Rutkowski went on to state that if he observed an unsafe condition, such as a worker without a hard hat, he would bring it to Meyers' attention. Rutkowski also indicated that Collins would report his observations of litter or other housekeeping and maintenance issues to Rutkowski, who in turn relayed them to Meyers, though Meyers stated he did not discuss maintenance or safety with Rutkowski or Collins. Rutkowski further testified that he had previously seen bales stacked nine feet high outside of the designated storage area, but did not know they presented an OSHA violation.

Supreme Court granted the County's motion for summary judgment. It held that

---

2. Plaintiff's wife, Nancy Gronski, sues derivatively.

3. In deciding the issue here we need not reach plaintiff's product liability claim.

"[l]ooking at the entire [agreement], the rights retained by the County do not create a duty to maintain a safe environment for an employee of Metro Waste . . . Under the [agreement] Metro Waste was responsible for all safety issues . . . There is no question of fact of control created by the terms of the [agreement]." (Emphasis omitted.)

Supreme Court further held that "the County, as an out-of-possession landlord who relinquishes control of the premises and is not contractually obligated to repair unsafe conditions, is not liable to the [p]laintiff . . . for personal injuries caused by an unsafe condition existing on the premises" (internal quotation marks omitted). The Appellate Division affirmed, holding that "[Supreme Court] properly analogized this case to those cases involving out-of-possession landlords" (*Gronski v County of Monroe*, 73 AD3d 1439, 1439 [4th Dept 2010]). The Appellate Division concluded that the County "met its initial burden of establishing that it did not exercise control over the subject [facility and] . . . [p]laintiff failed to raise a triable issue of fact" (*id.* [internal quotation marks omitted]). We granted plaintiff leave to appeal (15 NY3d 708 [2010]) and now reverse.

## II.

To begin, we reject the out-of-possession landlord standard as applied by the courts below as no leasehold was created by the agreement (*see Butler v Rafferty*, 100 NY2d 265, 271 n 3 [2003]). Generally, a landowner owes a duty of care to maintain his or her property in a reasonably safe condition (*see Peralta v Henriquez*, 100 NY2d 139, 144 [2003]; *see also Basso v Miller*, 40 NY2d 233, 241 [1976]). That duty is premised on the landowner's exercise of control over the property, as "the person in possession and control of property is best able to identify and prevent any harm to others" (*Butler*, 100 NY2d at 270). Indeed, "[i]t has been held uniformly that control is the test which measures generally the responsibility in tort of the owner of real property" (*Ritto v Goldberg*, 27 NY2d 887, 889 [1970]). Thus, a landowner who has transferred possession and control is generally not liable for injuries caused by dangerous conditions on the property (*see Chapman v Silber*, 97 NY2d 9, 19 [2001]). Control is both a question of law and of fact (*see Ritto*, 27 NY2d at 889).

In *Ritto*, we applied this standard and concluded that, despite a lease that transferred possession and control to commercial

tenants, the issue of whether the landlord actually exercised control over the premises was one for the jury (*see id.* at 888-889). There, the defendant landlord leased a room to operators of an automatic washing machine business, granting the tenants "exclusive use of the aforementioned room" (*id.* at 888). The plaintiff, a residential tenant injured by a defective washing machine, sued both the landlord and the commercial tenants (*see id.* at 887-888). While we found that, pursuant to the lease, the "landlord surrendered the right of occupancy . . . and reserved no control over the instruments used by those tenants in their business" (*id.* at 888), we concluded that:

> "[t]here is proof . . . from which a jury might determine that the landlord, by a long course of conduct of his employees in reporting malfunctions of the machines to the repair service and the owner, so intervened in the operation of the business as to give rise to a reliance by residential tenants in the building on reports of malfunction being made by the landlord. Hence a liability might result if reports were not made and this played an effective part in the occurrence of the accident" (*id.* at 889).

More recently, in *Butler*, we applied the control principle to find that the defendant, a tenant in common who entered into a non-lease agreement with his sister/cotenant, was not liable to a plaintiff injured on their jointly-owned property (*see* 100 NY2d at 268-271). The agreement divided the cotenants' living quarters and obligated both parties to share in expenses for maintenance and repairs (*see id.* at 267). The plaintiff, a guest who was injured after falling from a bunk bed on the sister's portion of the property (*see id.* at 267-268), contended "that [the brother's] control of the premises was established primarily through [the repair] clause in the contract" (*id.* at 271). We concluded that, because the defendant exercised no supervisory role over his sister's sphere, was not permitted access to it, and in fact could not access it due to a blocked entryway, he did not "in any way exercise[ ] possession or control over her portion of the property" (*id.*) and, therefore, could not be held in breach of a duty to the plaintiff (*see id.* at 270-271).

Thus, it follows that when a landowner and one in actual possession have committed their rights and obligations with regard to the property to a writing, we look not only to the terms of the agreement but to the parties' course of conduct—including, but not limited to, the landowner's ability to access the

premises—to determine whether the landowner in fact surrendered control over the property such that the landowner's duty is extinguished as a matter of law (*see id.*).

In this case, the agreement between the County and Metro Waste unambiguously assigned the responsibility to implement safe practices and to remedy unsafe conditions at the recycling center to Metro Waste. Significantly, however, the agreement vested the County with ultimate approval authority over Metro Waste's operating procedures. Morever, an examination of the County's conduct indicates that it maintained both a visible and vocal presence at the recycling center. Unlike the defendant in *Butler*, who was entirely excluded from his cotenant's portion of the property (*see id.*), here, the agreement granted the County supervisory rights and unfettered access to the facility. In fact, the County availed itself of those provisions through Collins' regular public tours and Rutkowski's routine, unannounced inspections. Though Rutkowski equivocated on the specific issue of his authority to monitor and remedy unsafe conditions— answering both yes and no to the question of whether he oversaw safety and maintenance issues—he offered specific examples of circumstances in which he would take action, such as upon observing workers without hard hats.

The dissent opines that unlike in *Ritto*, plaintiff did not demonstrate reliance on these aspects of Rutkowski's involvement in the operation of the recycling center (*see* dissenting op at 384). In *Ritto*, the fact that residential tenants came to rely on reports of washing machines' malfunctioning being made by the landlord's employees raised a question as to the landlord's exercise of control over the premises, despite the presumptive transfer of control accomplished by the leasehold between the landlord and the commercial tenants (*see* 27 NY2d at 889). *Ritto*, however, did not establish reliance on the landowner's conduct as a distinct element of the control analysis to be required in all cases going forward, especially where, as here, no leasehold exists.

Viewing all of the evidence in the light most favorable to the plaintiff, as we must on this motion for summary judgment (*see Branham v Loews Orpheum Cinemas, Inc.*, 8 NY3d 931, 932 [2007]), we cannot say, as did the lower courts, that, as a matter of law, the County relinquished complete control of the recycling center to Metro Waste. In focusing exclusively on the terms of the agreement to designate the County free from any duty owed to plaintiff, the courts below erred in failing to give due weight

to the County's course of conduct. The dissent places similar emphasis on the agreement, though it ignores the supervisory rights the agreement reserves to the County and the fact that the County enjoyed wide access to the facility. The dissent disparages that we should find, based on plaintiff's evidence, an issue of fact "over whether the County *assumed* control over the safety operations" (dissenting op at 384 [emphasis added]). Yet that position rests on a mistaken premise that absolute control was transferred to Metro Waste to begin with, despite the absence of a leasehold between Metro Waste and the County. Rather, the County, as landowner, remains in presumptive control over its property and subject to the attendant obligations of ownership until it is found that control was relinquished, either as a matter of law or by a factfinder after presentation of all of the evidence. As we do not agree with our dissenting colleagues that relinquishment of control is proved here as a matter of law, the issue that remains to be resolved by a trier of fact is whether the County, through its course of conduct, exercised sufficient control over the facility such that it owed plaintiff a duty to prevent and remedy the kind of condition that resulted in his injury.

Accordingly, the order of the Appellate Division should be reversed, with costs, and defendant's motion for summary judgment denied.

Pigott, J. (dissenting). It is undisputed that "control is the test which measures generally the responsibility in tort of the owner of real property" (*Ritto v Goldberg*, 27 NY2d 887, 889 [1970]). As we explained in *Ritto*, a landowner who relinquishes control of a premises may nonetheless be held liable for injuries that occur thereon if the landowner or its employees engage in a "course of conduct" from which a jury could infer that the landowner intervened in the operation of the premises to the point that it induced reliance by those utilizing it (*id.*). In my view, plaintiff simply failed to produce *any* evidence to establish that the County of Monroe, through its employees' conduct, so intervened in how the recycling center was run that it induced reliance on the part of Metro Waste and its employees to the point where the County should be held liable for the alleged improper stacking of the bales by Metro Waste employees.*

The comprehensive operations and maintenance agreement between the County and Metro Waste evidenced that the County

---

* The majority does not dispute that the County met its initial burden establishing its entitlement to summary judgment.

relinquished control over the operations of the recycling center to Metro Waste. The agreement identifies Metro Waste as "an independent contractor" that "shall have complete charge of and responsibility for the [recycling facility and its site], its subcontractors, materialmen, materials, equipment and personnel engaged in the performance of its work." Not only that, the agreement requires Metro Waste to "perform its work *in accordance with its own methods and have complete responsibility to direct and control its performance under the Agreement*, subject to the limited review authority of the County as set forth in the Agreement" (emphasis supplied).

Metro Waste's obligations with regard to safety of its employees are just as comprehensive as its obligations to run the recycling center, if not more so: Metro Waste was obligated to "maintain the safety of the [recycling center] at a level consistent with Applicable Law and normal industrial and solid waste management practices" and, most importantly here, "at its cost and expense," it agreed to

> "take all reasonable precautions for the safety of, and provide all reasonable protection to prevent damage, injury or loss by reason of or related to the operation of the [recycling center] to . . . all employees working at the [recycling center] and all other persons who may be involved with the operation or maintenance of the [recycling center]."

The aforementioned provisions are significant because the County and Metro Waste agreed that Metro Waste was in "complete charge" of the recycling center, had "complete responsibility to direct and control its performance," and that it was Metro Waste's duty to "provide all reasonable protection" to its employees. Moreover, according to the agreement, the recyclable materials were to be "properly stored prior to removal and transfer" and it was Metro Waste's responsibility to "expeditiously remedy any nuisance conditions." Therefore, given the comprehensive terms of this agreement, the only way the County could be found to have owed a duty to plaintiff is if it so intervened in the affairs of the recycling center that it induced reliance on the part of Metro Waste and/or plaintiff.

Plaintiff seeks to hold the County liable for allowing an "unsafe, insecure, unstable and dangerous condition" to be present at the recycling center, namely, the improperly placed and stacked bale that struck plaintiff. But there is no evidence in

this record that the County's employees affirmatively directed Metro Waste or its employees as to how the bales should have been stacked. The majority makes much of the fact that "Rutkowski . . . testified that he had previously seen bales stacked nine feet high outside of the designated storage area, but did not know they presented an OSHA violation" (majority op at 378), but this underscores the point that the County, pursuant to the agreement, was not charged with controlling how Metro Waste operated the recycling center. It also demonstrates that the County did not intervene in directing how the bales were stacked and, therefore, it could not be said that the County induced reliance on the part of Metro Waste or plaintiff through its conduct. Indeed, plaintiff testified that he was unaware of any instance where the County told Metro Waste employees where or how to stack the bales, and Metro Waste's general manager at the recycling center testified that it was Metro Waste's responsibility alone to determine how and where bales were stacked.

The mere fact that Rutkowski himself allegedly believed that he had oversight authority over maintenance and safety issues, as the majority states (majority op at 378), is irrelevant. Given the comprehensive nature of the agreement, it is Rutkowski's *conduct* that is relevant, not what Rutkowski *believed*. Plaintiff produced no evidence that would permit a jury to infer that the County controlled Metro Waste's operations as to how the bales were to be stacked and stored. In fact, the evidence indicates otherwise. Unlike the situation in *Ritto*—where the landowner's employees routinely reported malfunctions in the business tenant's washing machines to both the repair service and the business tenant, intervening in the operation of the business to the point where a jury could infer that the residential tenants may have been induced to rely on the landlord's reports of washing machine malfunctions—there is no evidence that any of the County's conduct could have induced reliance on the part of plaintiff that the County was in charge of how the bales were to be stacked.

How the majority can conclude that there is a question of fact over whether the County assumed control over the safety operations based on the testimony that Rutkowski complained about litter and cleanliness on occasion or would advise Metro Waste management if he observed an employee not wearing a hard hat is beyond me. None of that evidence raises a question of fact vis-à-vis the County's control over the recycling center's

operations or, more specifically, how the bales were stacked. Therefore, I would affirm the order of the Appellate Division.

Chief Judge LIPPMAN and Judges GRAFFEO and JONES concur with Judge CIPARICK; Judge PIGOTT dissents and votes to affirm in a separate opinion in which Judges READ and SMITH concur.

Order reversed, etc.