(January 22, 2013)

■ JOYCE ASABOR, Appellant, v ARCHDIOCESE OF NEW YORK et al., Respondents. [961 NYS2d 17]—

Order, Supreme Court, New York County (Richard F. Braun, J.), entered November 21, 2011, which, to the extent appealed from, granted so much of defendants' motion for summary judgment as sought to dismiss the sixth cause of action (retaliatory discharge) and to dismiss the complaint in its entirety as against the individual defendants, reversed, on the law, without costs, and the motion denied.

On July 6, 2004, plaintiff, Joyce Asabor, a Nigerian-born black woman, was hired to work as a mental health nurse at the Beacon of Hope House (Beacon), a defendant, and inpatient adult mental health facility located in Staten Island. Beacon is an operating division of defendant Catholic Charities Community Services, which, along with defendant Archdiocese of New York, funds health care services at a number of facilities, including Beacon.

Defendants Joy Jasper, Beacon personnel director, and Dennis Scimone, Beacon director (sued herein as Simone), interviewed Asabor and conferred with defendant Anne Tommaso, Beacon executive director, before determining to hire her. After she was hired, plaintiff reported to defendant Ron Morgan, an assistant director of residential services at the facility.

At her deposition, plaintiff testified that from the outset of her employment, coworkers openly discussed plans to sabotage her job, especially Sharon Quattrachi, a longtime Beacon employee and Scimone's secretary. Gloria Mascara, Quattracchi's close friend, often joined in plaintiff's mistreatment. On plaintiff's second day of work, someone hung a decomposing

bird on the back of her office door. Plaintiff recounted that Quattracchi smoked at the entrance to the building every morning, and that she blocked plaintiff's entrance with a folded elbow. She also stated that Quattracchi failed to give her business related messages, repeatedly called her an "African b[ ]h," stated that "something smells" when plaintiff walked by and directed her to "go back to the jungle." Plaintiff testified that throughout her employment at Beacon, coworkers openly declared their hatred of blacks. Defendants Morgan and Scimone were present on some of these occasions.

Within months, plaintiff complained to Scimone and Jasper about the work environment. Jasper directed plaintiff to start documenting the racist behavior, which she did. Plaintiff also noticed that staff members were stealing medication from patients and engaging in other violations of the Health Insurance Portability and Accountability Act (HIPAA). The record contains a number of citations issued by the New York State Office of Mental Health confirming that medication counts were inaccurate, that the medicine cabinet was unlocked, and that there were multiple illegible signatures on the medication administration record.

In or about August 2004, Tommaso, Jasper, and Scimone called a meeting with plaintiff at the head office of the Archdiocese, to discuss plaintiff's complaints. Plaintiff testified that she informed all of the participants at the meeting about rampant racial hostility at Beacon. She recounted the insulting language and behavior, as well as Mr. Scimone's dismissive attitude towards her verbal complaints—she testified that he would "shrug his shoulder[s] and make a face," but did nothing to address comments made in his presence. Tommaso asked plaintiff whether she intended to contact an attorney, and plaintiff said yes—"because no one was listening to [her]." Tommaso assured plaintiff that things were going to change.

On September 7, 2004, plaintiff got into a heated argument with Quattracchi. Scimone issued plaintiff a disciplinary notice in which he recounted the incident and stated that plaintiff ignored his directive to lower her voice, and to discuss the matter with him in his office. The notice states that plaintiff's conduct was both unprofessional and insubordinate. Quattracchi received no discipline for her part in the argument.

In response, plaintiff wrote a letter to Scimone in which she apologized for any acts deemed by Scimone to be insubordinate. However, she expressed frustration that Quattracchi was not disciplined, and that Scimone was not receptive to her view of the incident. In the letter, plaintiff also faulted Scimone for fail-

ing to address her concerns regarding HIPAA violations and medicine administration.

In response to plaintiff's letter, Scimone drafted another memo to her. With respect to "racial issues," Scimone promised to "promptly address [plaintiff's complaints] in collaboration with the agency's personnel department and other members of senior management, as necessary." Jasper subsequently came to Beacon and interviewed a number of staff members, including plaintiff. At the conclusion of the hearing, Jasper reported that Vanessa Harmon, a senior counselor at Beacon, had made racist remarks to plaintiff, and that Allen Bradley, a Beacon supervisor, was aware of Harmon's remarks and failed to take any action to stop the misconduct. Both employees were slated to be discharged; Bradley resigned in lieu of being terminated. Quattracchi and Mascara received no negative reports, though many of plaintiff's complaints concerned their behavior.

In reviews dated April 6-7, 2005, the State Office of Mental Health cited Beacon for "not consistently providing staff with cultural sensitivity training." The report noted that one employee received this type of training in 2003 and that no one was trained in 2004. In mid-May 2005, plaintiff, Quattracchi, Scimone, and Morgan met to discuss the personality conflict between Quattracchi and plaintiff. Plaintiff also testified that she had frequent conversations with Scimone and Morgan alone regarding Quattracchi's behavior. After the mid-May 2005 meeting, plaintiff wrote to Jasper, begging for her help and reiterating that the issue of Quattracchi's disdain for her had created an unbearable workplace in which she was not able to carry out her duties as an RN. No inquiry was conducted as a result of plaintiff's May 2005 letter.

Thereafter, on August 9, 2005, at about 2 p.m., a patient at the facility started hallucinating and called the police. Mascara called Kimberly Flory, Beacon's senior program supervisor, who advised her to call the patient's therapist. Plaintiff thought that she should be involved, because she was a nurse, but Mascara told her to leave the area. Plaintiff got angry, a fight began and it quickly escalated. At some point Quattracchi got involved. One or more doors were pushed into various individuals, and both plaintiff and Mascara suffered injuries. Flory had advised Mascara that plaintiff should be asked to leave the unit. Morgan eventually called plaintiff and asked her to leave the premises. Plaintiff followed his directive, but questioned the fairness of singling her out as the only one asked to leave. Plaintiff testified that she told Morgan that she was contacting counsel to address the racism at Beacon and the manner in which defendants condoned it.

On August 10, 2005, plaintiff, Quattracchi, and Mascara were suspended from work, pending an investigation of the incident. On the same day, plaintiff wrote to Scimone, reiterating her intent to contact an attorney. Plaintiff, Quattracchi, and Mascara were all eventually terminated for engaging in the altercation.

Plaintiff commenced this action, asserting six causes of action: (1) against all defendants, under the New York State Human Rights Law (State HRL), for race- and nationality-based employment discrimination; (2) against the Archdiocese, Catholic Charities, and Beacon for vicarious liability for the individual defendants' alleged wrongs; (3) against all defendants for intentional infliction of emotional distress; (4) against the Archdiocese for breach of employment contract; (5) against all defendants for negligent supervision and hiring of Quattracchi and Morgan; and (6) against all defendants for wrongful termination (based on plaintiff's allegedly disabling shoulder injury) and retaliation (for plaintiff's statement that she would be seeking legal counsel).

Defendants moved to dismiss the complaint, and the court dismissed plaintiff's second through fifth causes of action. Defendants subsequently moved for summary judgment dismissing the remainder of plaintiff's complaint. The court granted defendants' motion to the extent of dismissing the sixth cause of action (retaliation and disability discrimination) as to all defendants, and dismissing the entire complaint as to the individual defendants. Plaintiff appeals.

In reviewing defendants' motion for summary judgment, we must accept plaintiff's facts as true, and draw all reasonable inferences in the light most favorable to her (*Weiss v Garfield*, 21 AD2d 156 [3d Dept 1964]). The standard for determining the motion is whether there are any genuine and material disputed issues of fact (*see Glick & Dolleck v Tri-Pac Export Corp.*, 22 NY2d 439, 441 [1968]; *see also Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]). Summary judgment should not be granted where there is any doubt as to the existence of a factual issue or where the existence of a factual issue is even arguable (*Glick*, 22 NY2d at 441). Moreover "[i]t is not the court's function on a motion for summary judgment to assess credibility" (*Ferrante v American Lung Assn.*, 90 NY2d 623, 631 [1997]). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict" (*Anderson v Liberty Lobby, Inc.*, 477 US 242, 255 [1986]).

## Retaliatory Discharge[1]

Under the State HRL, it is unlawful to retaliate against an employee for opposing discriminatory practices (see Executive Law § 296 [7]). To prove unlawful retaliation, a plaintiff must show that (1) she has engaged in protected activity, (2) her employer was aware that she participated in such activity, (3) she suffered an adverse employment action, and (4) there is a causal connection between the protected activity and the adverse action (*Forrest v Jewish Guild for the Blind*, 3 NY3d 295, 312-313 [2004]). Here, plaintiff has established the first two prongs, and has raised issues of fact regarding the third and fourth prongs sufficient to require the denial of defendants' motion for summary judgment.

Regarding protected activity, plaintiff made numerous complaints that Beacon was infested by unlawful discrimination, of which she was a frequent target, and she indicated both orally, and in writing, her intent to call an attorney if those in supervisory positions at Beacon did not act to remedy the rampant and blatant racist conduct of Quattracchi and others that she was required to endure in order to bring home a paycheck. The hostility at Beacon imploded on the afternoon of August 9, 2005, and as plaintiff was suspended for her role in the altercation, she reiterated her intention to call a lawyer.

With respect to her employers' awareness of the protected activity, it is plain that all of plaintiff's supervisors knew she was unhappy with the way she was treated. She indicated as early as the meeting in the fall of 2004 that she intended to seek an attorney if the racist behavior did not end. Jasper, one of plaintiff's supervisors, actually suggested she keep a log of unlawful acts and statements.

Defendants proffered a legitimate nondiscriminatory basis for terminating plaintiff—the prohibition against workplace altercations. However, the fight was the direct result of 13 months of escalating hostility of which defendants were aware, and which the record reflects stemmed from racial animus. It is arguable that by firing all three participants in the fight—plaintiff, Quattracchi and Mascara—defendants were acting in a race neutral manner. An equally plausible inference, given the nature and degree of unaddressed racial animus at Beacon, is that defendants were motivated by a justified fear of liability stemming from an insufficient response to plaintiff's complaints (see *Glick*,

---

1. Plaintiff has abandoned her claim of retaliation based on her allegedly disabling shoulder injury, by failing to address it in her brief (see *Mehmet v Add2Net, Inc.*, 66 AD3d 437, 438 [1st Dept 2009]).

22 NY2d at 441 [drastic remedy of summary judgment should not be granted where an issue is "arguable" (internal quotation marks omitted)]).

As the Court of Appeals has recognized, discrimination is "[usually] accomplished . . . by devious and subtle means" (*Ferrante*, 90 NY2d at 631 [internal quotation marks omitted]). Given that competing inferences are reasonably drawn from this record, summary judgment is not warranted. It is the province of a jury to weigh the evidence, assess credibility, and ultimately determine whether defendants' actions were retaliatory.

## Individual Defendants

The record also raises an issue of fact as to whether the individual defendants were plaintiff's employers for purposes of the State HRL (Executive Law § 296 [1] [a]; *see Patrowich v Chemical Bank*, 63 NY2d 541 [1984]; *Pepler v Coyne*, 33 AD3d 434 [1st Dept 2006]; *Lapidus v New York City Ch. of N.Y. State Assn. for Retarded Children*, 118 AD2d 122, 131 [1st Dept 1986]). Tommaso, Jasper, Scimone and Morgan all had the authority to make and effectuate high-level managerial decisions. They did more than carry out personnel decisions made by others (*Patrowich*, 63 NY2d at 542). Jasper attested that she and Scimone interviewed plaintiff for her position. She also testified that after conferring with Tommaso, she and Tommaso made the decision to hire plaintiff. Jasper encouraged plaintiff to keep track of racial incidents, and advised plaintiff to come to her with any problems. Morgan similarly advised plaintiff to come to him so that he could handle any problems she was having with Quattracchi. After plaintiff wrote to Jasper and Scimone, they, and Tommaso, held a meeting at the Archdiocese headquarters, and promised to stem the hostile work environment at Beacon. Plaintiff testified that she brought problems with Quattracchi to Scimone's attention, but he repeatedly shrugged them off.

Viewing the evidence in the light most favorable to plaintiff, we find that issues of fact exist as to whether defendants condoned racially discriminatory conduct, by approving or acquiescing to the actions of individuals such as Scimone's secretary, Quattracchi, and Gloria Mascara (*see Matter of State Div. of Human Rights v St. Elizabeth's Hosp.*, 66 NY2d 684, 687 [1985]; *Goering v NYNEX Info. Resources Co.*, 209 AD2d 834 [3d Dept 1994] [calculated inaction to employee's harassing conduct may readily indicate condonation]). However, plaintiff failed to identify any evidence that any of the individual defend-

ants "actually participate[d]" in the alleged discriminatory acts so as to support her alternative theory of individual liability on the grounds of aiding and abetting the alleged acts (*see Forrest v Jewish Guild for the Blind*, 3 NY3d 295, 328 [2004, Smith, J., concurring] [internal quotation marks omitted]; Executive Law § 296 [6]). Concur—Gonzalez, P.J., Renwick and Manzanet-Daniels, JJ.

Friedman and Román, JJ., dissent in part in a memorandum by Friedman, J., as follows: Given our obligation to assume the truth of plaintiff's factual allegations (which defendants vigorously dispute) for purposes of deciding this appeal, I concur with the majority insofar as it reinstates the action as against the individual defendants. However, I must emphatically dissent from the majority's reinstatement of the cause of action for retaliatory discharge. Granted, plaintiff has satisfied her "de minimis burden of showing a prima facie case" (*Melman v Montefiore Med. Ctr.*, 98 AD3d 107, 115 [1st Dept 2012] [internal quotation marks omitted]) that her discharge was retaliatory in nature, in that she threatened to sue her employer as she left the premises on the day she was suspended from her employment at defendant Beacon of Hope House, and was subsequently terminated. However, as the majority acknowledges, defendants have come forward with a legitimate nondiscriminatory basis for plaintiff's termination—namely, her involvement in a physically violent workplace altercation with two other employees on the day before she was suspended. Moreover, any reasonable inference that the true reason for the termination may have been the threat to sue is conclusively negated by the uncontroverted fact that the two other employees involved in the altercation with plaintiff were also suspended and terminated based on that incident, even though they did not threaten to sue. It is undisputed that defendant Scimone, a manager at Beacon, prepared an investigative report on the incident, in which he concluded that plaintiff and the two other employees involved had violated Beacon's policy against fighting in the workplace and, based on that misconduct, recommended the termination of all three employees. Pursuant to that recommendation, plaintiff and the two employees with whom she had fought were terminated within three weeks of the incident.

Plaintiff does not dispute that the altercation in question occurred; that she was involved in it; that such conduct violated Beacon's policy against fighting in the workplace; and that all three employees involved in the altercation were suspended the next day and, ultimately, were terminated, with the reason given being the altercation. Notably, plaintiff offers no evidence that

either of the other two terminated employees threatened Beacon with legal action before they were fired. In sum, the record offers no rational basis for concluding that plaintiff, like her two antagonists, was terminated for any reason other than violating her employer's rule against physical fighting in the workplace—a rule essential for any workplace, but especially for a mental health facility like Beacon.

The majority appears to be unduly influenced by plaintiff's litany of complaints (all disputed by defendants) about her treatment at Beacon before the altercation that triggered her termination. Had plaintiff been the only employee fired, perhaps those allegations could support an inference that retaliation was the motive for the discharge. But, to reiterate, this was not the case. All three employees involved in the altercation were found to have violated the no-fighting policy and were dismissed, regardless of any threats of litigation. While I agree that, by alleging the bare facts that she threatened to sue her employer and was subsequently fired, plaintiff set forth a prima facie case of retaliation sufficient to shift to defendants the burden of "com[ing] forward with admissible evidence that it had 'legitimate, independent, and nondiscriminatory reasons' " (*Melman*, 98 AD3d at 115, quoting *Forrest v Jewish Guild for the Blind*, 3 NY3d 295, 305 [2004]) for her termination, once defendants have proffered admissible evidence that they had such a legitimate and independent reason, plaintiff is no longer entitled to rely on "the minimal prima facie case" (*Melman*, 98 AD3d at 115 [internal quotation marks omitted]) to defeat a well-supported summary judgment motion (*see id.* at 122-123). She must come forward with admissible evidence that, if credited, would refute the proffered reason for her termination.[2]

In this case, the majority reinstates plaintiff's retaliatory discharge claim notwithstanding unrefuted evidence that she was terminated for violating her employer's prohibition on conduct clearly intolerable in the workplace (fighting), a policy that the employer applied equally to the other employees involved in the same incident who did not threaten to sue (and who were not members of plaintiff's protected class). In so doing, the majority sends the message that an employee who commits workplace misconduct may deter the employer from taking disciplinary ac-

---

**2.** As we recently noted, "in employment discrimination jurisprudence, the term 'prima facie case' is used to denote the establishment by plaintiff of facts sufficient to create a legally mandatory, rebuttable presumption, rather than the more traditional meaning of describing plaintiff's burden of setting forth sufficient evidence to go before the trier of fact" (*Melman*, 98 AD3d at 122 [internal quotation marks and ellipsis omitted]).

tion by the simple expedient of threatening to sue before a penalty is imposed. I do not believe that the Human Rights Law was intended to afford such protection to employees who engage in misconduct in the workplace, as the record shows plaintiff did here. It is simply preposterous to suggest that the Human Rights Law was meant to call an employer to task for dismissing an employee at a mental health facility who involves herself in a physical altercation at work. Accordingly, I dissent from the portion of the majority's decision denying defendants' motion for summary judgment dismissing the cause of action for retaliatory discharge.