*686 OPINION OF THE COURT
Sherry Klein Heitler, J.
Plaintiff Morton Frieder has been diagnosed with mesothelioma. Mr. Frieder and his wife Rosalind Frieder commenced this action on or about April 20, 2012 to recover for personal injuries caused by Mr. Frieder’s exposure to asbestos. Defendants the Long Island Railroad and the Metropolitan Transportation Authority (collectively, LIRR) now move pursuant to CPLR 3212 for summary judgment dismissing the complaint and all cross-claims asserted against them. For the reasons set forth below, the motion is denied.
Background
From 1972 to 1979 Mr. Frieder worked as a cashier at the so-called Dashing Dan Diner (the diner), a small trailer located within the LIRR’s Morris Park maintenance facility. The diner was privately owned and operated by the Greenberg family, which apparently had an arrangement with the LIRR to provide diner services exclusively to LIRR employees at that location.[1] Plaintiffs contend that the sole source of Mr. Frieder’s asbestos exposure was asbestos-laden clothing that the LIRR workers wore into the diner. In this regard, Mr. Frieder testified[2] that he encountered approximately 200 LIRR workers every day (plaintiffs’ exhibit A at 28-29):
“Q. how many customers would come in and out of the diner during the day?
“A. During the day, couple hundred.
“Q. How many customers would be in the diner at any one given point, for instance, during the morning?
“A. Thirty-five to 40. They would come in. They would seat [sic]. Some would just line up, wait for their coffee and go out, and others would sit and have sandwiches, have eggs, whatever they ordered.
“Q. And was this the same during the lunch?
“A. Lunch was the same type of situation. We would get a big rush of people coming in at one time, what *687 ever their break was.
“Q. Where were you in the diner when customers were coming in?
“A. I was behind the counter assisting — either taking orders, assisting the grill man if the grill man was busy or coming out to clean up the area after the people left to clean the counters, clean the — you know, clean that area up so that other people could sit down.”
The LIRE employees who patronized the diner belonged to trade unions. They included electricians, carpenters, machinists, and metal workers. In the morning they generally came into the diner wearing their street clothes. As the day progressed, however, more and more workers showed up to the diner wearing overalls, gloves, hard hats, and goggles (plaintiffs’ exhibit A at 39):
“Q. Why do you believe you were exposed to asbestos?
“A. Because when the workers came in off their breaks, they had made no attempt to clean up. They would come in. They would bang off their boots, take their gloves off and throw them on the counter. If they had a coat or jacket on, they would just shake it off, and that’s — you know, that would be the reason that I would be exposed to asbestos.
“Q. What kind of conditions did that create in the diner when they were—
“A. Well, it created a condition that there was dust all over the place, and after every one of these shifts required us to do a really heavy sweeping and cleanup of the diner.”
Mr. Frieder did not know specifically what the LIRE employees worked on before they took their breaks at the diner, nor did he know the source of the dust on their clothing. There were no notices or warnings posted by the LIRE about asbestos. Mr. Frieder did not complain about the conditions in the diner to his employer or the LIRE (plaintiffs’ exhibit C at 84-85):
“Q. Did you ever complain to the [LIRR] about the condition of the customers’ clothing while you were there?
“A. No.
“Q. While you were there, do you know the types of jobs that anybody did while you were there?
“A. Specifically?
*688 “Q. Specifically?
“A. No.
“Q. When you were there, did you know what these people were doing? . . .
“A. . . . No, I don’t know.”
Former LIRR boilermaker George Muckian worked at the Morris Park facility during the relevant time period and described in detail the work he did that caused his clothing and body to be covered in asbestos dust.[3] Each morning, he prepared boilers for repairs to be conducted that day by breaking off chunks of old asbestos cement where it had cracked and discarding them. He then took large bags of powdered asbestos cement from the LIRR stockroom, mixed it with water, and applied it to the areas of the boilers that needed it. This process caused a lot of dust to be released into the air around him (plaintiffs’ exhibit B at 37-39):
“Q. And what did this process look like when you were dumping the contents of the bag into the mixing pan?
“A. Very dusty. It was all white. We used to dump, like I said, four or five bags in a pan.
“Q. And was there any writing on these bags?
“A. Just one. It only said asbestos on the bag. . . .
“Q. . . . After you poured the stuff into the—
“A. Mixing pans.
“Q. — mixing pans what did you look like after pouring the stuff into the mixing pans?
“A. It was white all over my clothes. Like all over, just a cloud. . . .
“Q. . . . And did this stuff get on your clothes?
“A. Yes.
“Q. Did it get in your hair?
“A. Yes.
“Q. Did it get on your hands?
“A. Yes.”
After preparing the boilers for repair and mixing the cement, Mr. Muckian would eat breakfast at the diner. Mr. Muckian testified that during the morning rush there were usually 30 to *689 40 LIRR employees waiting to be served. He specifically recalled seeing Mr. Frieder at the cash register on a daily basis. Mr. Muckian testified that he and his fellow LIRR employees did not change out of their work clothes before going into the diner.
Discussion
The LIRR claims there is nothing to show that Mr. Frieder actually was exposed to asbestos dust while working at the diner. Further, the LIRR claims it owed no duty to Mr. Frieder to warn him of the dangers associated with asbestos or prevent him from being exposed to hazardous conditions at the Morris Park facility. Plaintiffs claim that as a landowner the LIRR owed a duty to invitees such as Mr. Frieder to keep its premises safe by warning all those present at the Morris Park facility of the hazards associated with long-term asbestos exposure, and that it is a question of fact whether Mr. Frieder’s interaction with LIRR employees caused his injuries. Plaintiffs further submit that the motion should be denied outright because the LIRR has not responded in good faith to New York City asbestos litigation (NYCAL) standard interrogatories for premises owners and NYCAL product identification interrogatories and requests for documents. The defendants reply that the requested discovery is not relevant to whether the LIRR owed a duty to warn to the plaintiff or breached its duty of care to him.
It has long been the rule in New York that a landowner owes a duty of care to maintain his or her property in a reasonably safe condition. (Gronski v County of Monroe, 18 NY3d 374, 379 [2011]; Kush v City of Buffalo, 59 NY2d 26, 29 [1983].) “That duty is premised on the landowner’s exercise of control over the property, as ‘the person in possession and control of property is best able to identify and prevent any harm to others.’ ” (Gronski at 379, quoting Butler v Rafferty, 100 NY2d 265, 270 [2003].) “[C]ontrol is the test which measures generally the responsibility in tort of the owner of real property.” (Alnashmi v Certified Analytical Group, Inc., 89 AD3d 10, 16 [2d Dept 2011], quoting Ritto v Goldberg, 27 NY2d 887, 889 [1970].) “[C]ontrol refers to the ability of an out-of-possession landlord to remedy dangerous conditions, and it pertains to conditions on any portion of the leased premises.” (Alnashmi at 17.) The issue of control is “both a question of law and of fact.” (Gronski at 379.) Thus, while a landowner who has transferred possession and control is generally not liable for injuries caused by dangerous conditions on the property, summary judgment is not appropriate where the issue of control is uncertain.
*690 In Gronksi the Court of Appeals held that defendant Monroe County did not, as a matter of law, relinquish control over a county-owned but independently-operated recycling center and therefore the County could be liable to the plaintiff for injuries sustained as a result of unsafe conditions on the premises. Although the County and the operator of the recycling center, Metro West, had an agreement which “unambiguously assigned the responsibility to implement safe practices and to remedy unsafe conditions at the recycling center to Metro West,”[4] the Court concluded that the County’s actual conduct, which included regular tours of, unfettered access to, and unannounced inspections of the facility, raised an issue of fact for the jury whether the County exercised control over the property. (Gronski at 381.)
Similarly, in Ritto, the defendant landlord leased a room in its premises to operators of an automatic washing machine business and granted its tenants exclusive use of the room. A tenant injured by a defective washing machine sued both the landlord and the commercial tenants. The Court of Appeals found that despite the lease, a jury could nevertheless find the landlord liable on the premise that it had “so intervened in the operation of the business as to give rise to a reliance by residential tenants in the building on reports of malfunction being made by the landlord.” (Id. at 889.)
In this case, it is evident that the LIRR controlled the circumstances of the diner and was in the best position to identify and remedy the dangerous condition that allegedly gave rise to Mr. Frieder’s injury. It is undisputed that the LIRR owned the Morris Park facility and that it maintained a fence and front gate which prohibited entry into the yard by the general public. The LIRR had exclusive control over the working conditions within the repair yard. Its employees made up all of the diner’s patrons. Plaintiffs have shown that the LIRR supplied power and heat to the diner. It also appears that the LIRR had some say over the diner’s operating hours through an agreement which required the diner to stay open during snowstorms to service LIRR employees. (Affirmation of Lori A. Benavides, Esq., dated Jan. 30, *691 2012 at 3.) While the Greenberg family independently owned and operated the trailer which housed the diner, they had no control over the land on which the diner sat, the systems to which it was connected (i.e., heating and power), the materials that were used at the Morris Park facility, or the LIRE employees who are alleged to have carried asbestos dust on their work clothes into the diner. Thus, it was the LIRE, and not the diner, that was in the best position to know about the use of asbestos on the premises and to take reasonable care to prevent Mr. Frieder’s exposure thereto.
In reliance on Matter of New York City Asbestos Litig. (5 NY3d 486 [2005]) (Holdampf), the LIRE contends that the imposition of a duty of care in this case would improperly enlarge the range of duties presently owed by employers and landowners to third parties. In Holdampf the wife of a Port Authority employee alleged injury from exposure to asbestos dust while laundering her husband’s uniforms that he wore home from work even though the Port Authority offered its employees on-site laundry service. The plaintiff argued that the Port Authority was in the best position to prevent the husband from leaving work with asbestos-contaminated clothing and that it had a duty to adequately warn of the potential hazard associated with him doing so. In holding that the Port Authority did not owe the wife a duty of care, the Court of Appeals explained that an employer’s duty to provide a safe workplace is limited to its own employees and that a landowner’s duty of care does not generally extend beyond its own premises where the potentially hazardous condition is not released into the ambient air but was carried off-site on the plaintiffs husband’s clothing.
The Holdampf Court further explained that its reluctance to extend liability to a defendant for its failure to control the conduct of others was due to “practical concerns both about potentially limitless liability and about the unfairness of imposing liability for the acts of another.” (Id. at 493, quoting Hamilton v Beretta U.S.A. Corp., 96 NY2d 222, 233 [2001].) The Court concluded (Holdampf at 495 [citation omitted]):
“Although plaintiffs protest that the Port Authority was ‘in the best position to protect against the risk of harm’ ... to [the wife] because it might have compelled [the husband] to wear clean clothes home from work or to warn [the wife] about the dangers of washing his soiled uniforms, the Port Authority was, in fact, entirely dependent upon [the hus *692 band’s] willingness to comply with and carry out such risk-reduction measures.”
Holdampf is fundamentally distinguishable from the case at bar. Here, the LIRR had control of both the work site where the alleged exposure occurred and its employees. Unlike the husband in Holdampf who wore his asbestos-covered clothes home, the workers here never left the Morris Park facility and thus never left the LIRR’s sphere of influence. In such circumstances, I find that the LIRR owed Mr. Frieder a duty of care.[5]
The LIRR’s concern that such a ruling would result in limitless liability due to the fact that, on occasion, vendors and family members of diner employees visited the diner is unconvincing. The threat of limitless liability is naturally circumscribed by the boundaries of the Morris Park facility and the unique relationship between Mr. Frieder and the LIRR. (See Holdampf at 498 [“the ‘specter of limitless liability’ is banished only when ‘the class of potential plaintiffs to whom the duty is owed is circumscribed by the relationship’ ”] [citation omitted].)
In asbestos-related litigation, the plaintiff on a summary judgment motion must demonstrate that there was actual exposure to asbestos fibers released from the defendant’s product. (Cawein v Flintkote Co., 203 AD2d 105, 106 [1st Dept 1994].) In this regard, it is sufficient for the plaintiff to show facts and conditions from which the defendant’s liability may be reasonably inferred. (Reid v Georgia-Pacific Corp., 212 AD2d 462, 462 [1st Dept 1995].) All reasonable inferences should be resolved in the plaintiff’s favor. (Dauman Displays v Masturzo, 168 AD2d 204, 205 [1st Dept 1990].)
As set forth above, Mr. Frieder testified that LIRR employees routinely entered the diner in dust-covered work clothes, but that he did not know the source of such dust. Plaintiffs have submitted the testimony of two former LIRR employees who worked in the Morris Park facility at the same time as Mr. Frieder. One of these employees, Mr. Muckian, testified that he regularly encountered Mr. Frieder at the diner while wearing his asbestos-covered work clothes (plaintiffs’ exhibit B at 33-40, 56-65):
*693 “Q. And during the day throughout the day while you were working in the boiler room in the summer months, did you guys ever get any breaks?
“A. 10:00.
“Q. And what did you do during the 10:00 break?
“A. We can go to the diner and get coffee.
“Q. And how long did you get for that break?
“A. Twenty minutes.
“Q. Did you ever change your clothes before going into the diner to get coffee?
“A. No.
“Q. Did you, during these coffee breaks in the morning, did you ever see [Mr. Frieder] at the diner?
“A. Yes.
“Q. How many workers would approximately go to the diner during coffee break?
“A. Ten, 15, 20 workers, maybe more. . . .
“Q. . . . And what about lunch?
“A. Sometimes I had lunch in the diner.
“Q. How often would you have lunch in the diner?
“A. Twice a week, three times a week maybe.
“Q. And what — how many people were in the diner during lunchtime?
“A. Twenty to 30 people. . . .
“Q. . . . During these breaks and during the lunch break, did you ever change out of your clothes—
“A. No. . . .
“Q. . . . Did you see anybody else at the yard do that?
“A. No.
“Q. And during lunch breaks did you see [Mr. Frieder] at the diner?
“A. Yes.
“Q. How many days was [Mr. Frieder] at the diner during your lunch breaks?
“A. Usually, five days a week.”
Plaintiffs also provide the testimony of Mr. Norman McCollum[6] who, between 1972 and 1978, worked as an electrician in the roundhouse across from the diner assisting with periodic inspec *694 tions of LIRE locomotives. Among other things, he repaired arc chutes, power contractors, fuel pump motors and crank case exhaustion motors; replaced cables in the motors of main generators; and worked on steam generators. Mr. McCollum testified that this work exposed him to asbestos and that he witnessed other LIRE employees, including maintenance workers, machinists, pipefitters and boilermakers, being exposed to asbestos while working with similar products.
Defendants argue that while Mr. Frieder described the LIRE employees he served as “filthy,” he had no actual knowledge of where they had been prior to entering the diner and so he could not know that the dust he saw on their clothes and on the diner floor was in fact asbestos dust. Defendants further argue that Mr. McCollum’s testimony is irrelevant because he never stated that he or anyone else ever entered the diner and that Mr. Muckian’s testimony is unreliable because he testified that neither he nor any of his coworkers ever believed there was asbestos on their work clothes (plaintiffs’ exhibit B at 111-113).
To the contrary, the deposition testimony of Mr. Frieder and Mr. McCollum establish that asbestos was routinely used at the Morris Park facility and that Mr. Frieder served LIRE employees who were covered in work-related asbestos dust. While plaintiffs have not shown that Mr. McCollum ever personally entered the diner or came into contact with Mr. Frieder, his testimony, in conjunction with the testimonies of Messrs. Frieder and Muckian, creates a question of fact whether LIRE workers with contaminated clothes entered the diner and exposed Mr. Frieder to asbestos. (See O’Brien v National Gypsum Co., 944 F2d 69, 72 [2d Cir 1991] [Circumstantial evidence alone is sufficient to withstand summary judgment in asbestos cases]; see also Jamieson v A C & S, Inc., 1998 WL 635549, *3, 1998 US Dist LEXIS 14451, *8 [SD NY, Sept. 16, 1998, No. 93 Civ. 7957 (RWS)], quoting Kreppein v Celotex Corp., 969 F2d 1424, 1426 [2d Cir 1992] [Proof of causation can be sufficient “notwithstanding the lack of identification of the precise product that injured a given plaintiff’].) What is important is that plaintiffs have alleged facts and conditions from which the LIRR’s liability may be reasonably inferred, that is, that the plaintiff worked in the vicinity where asbestos containing products were used, and that he was exposed to asbestos therefrom. (Matter of New York City Asbestos Litig., 216 AD2d 79, 80 [1st Dept 1995]; Reid.)
Whether Mr. Muckian contradicted himself at different points during his deposition is a question of fact for the jury and should *695 not be decided as a matter of law. (See Asabor v Archdiocese of N.Y., 102 AD3d 524, 527 [1st Dept 2013]; Alvarez v New York City Hous. Auth., 295 AD2d 225, 226 [1st Dept 2002]; Dollas v Grace & Co., 225 AD2d 319, 321 [1st Dept 1996] [“The assessment of the value of a witnesses’ testimony constitutes an issue for resolution by the trier of fact”].)
The court has considered the defendants’ remaining contentions and finds them to be without merit.
Conclusion
Accordingly, it is hereby ordered that the LIRR’s motion for summary judgment is denied in its entirety; and it is further ordered that the LIRR is directed to confer with plaintiffs and the special master concerning outstanding discovery.

. Mr. Frieder also sometimes worked at a cafeteria operated by the Green-berg family at the LIRR headquarters in Jamaica, New York, but plaintiffs do not allege that he was exposed at that location.

. Mr. Frieder was deposed on July 6, 2012 (plaintiffs’ exhibit C). Mr. Frieder’s videotaped deposition was taken on July 20, 2012 (plaintiffs’ exhibit A).

. Mr. Muckian was deposed on September 11, 2012 (plaintiffs’ exhibit D). His videotaped deposition was taken on September 14, 2012 (plaintiffs’ exhibit B).

. The operations and maintenance agreement between the two parties stated that Metro West “shall have complete charge of and responsibility for the Facility and Facility Site, its subcontractors, materialmen, materials, equipment and personnel engaged in the performance of its work [and] . . . shall perform its work in accordance with its own methods . . . subject to the limited review authority of the County.” (Gronski at 377.)

. Even were the court to consider the diner a separate property unto itself and entirely distinct from the Morris Park facility, there is still a basis upon which to find that a duty of care exists. (See 532 Madison Ave. Gourmet Foods v Finlandia Ctr., 96 NY2d 280, 290 [2001] [“A landowner who engages in activities that may cause injury to persons on adjoining premises surely owes those persons a duty to take reasonable precautions to avoid injuring them”].)

. Mr. McCollum was deposed on February 26, 2010 (plaintiffs’ exhibit E). His video deposition was taken on March 30, 2010 (plaintiffs’ exhibit F).